May it please the Court, my name is David Browery. I represent the appellant for first degree murder and discharge of a firearm during the commission of a crime of violence, or in the alternative, remand for a new trial. At the trial, the government was allowed to introduce a testimony of a special agent concerning the firing capabilities of an antique firearm allegedly used in this crime. This firearm is so old that the ATF firearms library does not have a copy of it. Therefore, there are no information about the specifications or firing capabilities of that weapon, nor was the special agent able to use the weapon to load it with the alleged ammunition used to see if it could fire that. This is a defect under Rule 702 regarding the basis for the knowledge and information available to the expert. The expert also connected the crime to photos that were in Mr. Bagola's Facebook records concerning this antique firearm. Our position is that this testimony should not have been accepted. It was not relevant to the purposes under 702, and instead how it was used was to bolster the credibility of the other people at the presence of this killing. That was the subject of the defense that there was no credibility to these witnesses. Cassandra Goings was outside of the building where the murder occurred. She did not see it. She was told that Mr. Bagola killed the victim by Mr. Reddy, the owner of the home, the person who had just been shorted in his drug deal, the person who took the keys from the corpse, the person who allegedly took other drugs from the corpse in the car. Mr. Reddy also provided testimony regarding occurrences that morning, pointing the finger at Mr. Bagola. The other two witnesses, Mr. Freeman, did not see the shooting occur. He fled. He saw a flicker as Mr. Bagola was running away from the home. There's no information from Mr. Freeman regarding what exactly occurred. Mr. Buckman had just purchased drugs from Mr. Reddy. He had used those drugs in the bathroom. He was also the person who saw shadow people, had had prior relationships with four-fingered alien women, and was on the search for alien gold. The government acknowledged the limitations of these witnesses in its closing arguments and said, well, it's a corroboration of details. Well, that corroboration was made by the expert witness improperly. We ask that the court remand for a new trial without this improper expert testimony. If there are no questions on that issue, I'd like to now turn to the 924C issue regarding crime of violence for a first-degree murder. As to first-degree murder, we believe this precedent in Genesee is inapplicable or merely dicta as it regards first-degree murder malice of forethought. What that decision did not touch on is first-degree felony murder with malice of forethought. And it says statements about malice of forethought is sufficient and no court has found that, but that's only within the limited circumstances of second-degree murder. For example, Jackson, which is roundly cited by the government, found that first-degree felony murder is not a crime of violence. Therefore there are crimes that malice of forethought is found by the jury, but do not qualify as crimes of violence because of the first-degree felony theory. Isn't that just because in some cases they can be committed with recklessness? Yes, they can. And as this Court found in Longahill, that arson can be committed with recklessness or extreme recklessness. But if we were to find that this statute was divisible, then we would apply the modified categorical approach. Correct. Correct. So our theory is first-degree murder, at least in the felony context, can be committed with extreme recklessness, not be a crime of violence. Under the arson theory, under a kidnapping theory, any of those established principles. Therefore, Genise doesn't really correctly apply to that aspect of first-degree murder. The question then becomes, as Your Honor identified, whether first-degree murder is divisible. It's one statute. It's one sentence. It's one punishment. It's one crime. Now, the parties have discussed the Shadd decision, talking about how felony murder, first-degree murder, is applied in Arizona specifically in that case. However, the Shadd decision also discusses sister statutes from 12 other states that also find that jury unanimity or that it is the same crime, 12 states. Oregon, is the only state identified in Shadd that doesn't follow sort of the Sullivan rule from New York. In the concurring opinion of Justice Scalia, he pulls in the idea that the Federal statute is the same as the state statutes. They all have their genesis in the Pennsylvania statute from 1794. This Court, in the Allen decision, adopted Tenth Circuit case law, or at least referenced case law from the Tenth Circuit, that a charge can be filed, a count of felony murder and premeditated murder. A jury can find premeditated murder and felony murder in one count from one indictment. Therefore, for purposes of jury unanimity, for purposes of duplicity, for purposes of multiplicity, the Tenth Circuit and the Eighth Circuit, by adopting that rationale, finds that these are the same crime within those contexts. Therefore, it should be the same crime under the crime of violence analysis. I want to talk a little bit more about your divisibility theory. If you look at it, it is a single sentence, and that always makes divisibility seem like kind of an unusual thing, but it's got a shopping list in it of methods of violation of the statute, any one of which is sufficient. And you only got to prove one of them. And you're only going to be able to prove one of them, right? I mean, usually, right? And so aren't they, you know, don't they start off looking awfully divisible? I mean, if you look at it, it's like, you know, espionage, right? Well, you're only going to prove espionage, you know, using a certain sequela of fact, right? And it's not going to be the same sequela of fact of, say, you know, aggravated sexual abuse, right? And it's not going to be the same sequela of fact of, say, you know, aggravated sexual abuse, right? And so, you know, as we look at the elements, they're divisible in that sense. And we're talking about a premeditated murder with malice of forethought, and that's a different animal than a death that is committed with malice of forethought related to, say, a crime of sabotage resulting in a death that could give rise to a conviction for first degree murder, right? Now, to say that that's not divisible somehow from the, I said I was going to kill somebody, I went to the place with people understanding I was going to kill somebody, and then I killed somebody. I think that's the rationale of the dissenting opinion in Schad, is that the conduct is so distinct and different under each of these aspects. And that's what was rejected in Schad when looking at this. And I think that same analysis should be applied to the Federal statute. Also, in the sides case, one of the Tenth Circuit cases, there was a question of whether the killing of the female victim in the sides case was a premeditated murder or subject to part of the felony murder for burglary. And they said, well, it doesn't really matter. Yes, there can be different ways, but what we're avoiding by calling it a single crime, what we're avoiding by considering it one unit is jury unanimity issues, duplicity issues, all these other aspects that we would consider it a single crime. That same analysis carries over, even though we can come up with situations where wildly different circumstances lead to different mens rea, those sorts of things that underlie it. That's what the categorical approach is all about, is we don't have to look at that. We have to look at the least culpable conduct. That's what Mathis tells us to understand, how the genesis of this ability. What was that? To divisibility. Right. Whether they are means or element. I mean, you're just saying that Jackson's footnote 7 is wrong. That Jackson's footnote 7 is wrong? Yes. When they address in some detail your Shand argument. Right. And I disagree with that analysis because the historical context is different, the analysis in Shand. What's different? The historical context, meaning the legislature's intent, which is the key, Mathis says. Look at what the legislature meant. If we can't figure that out, we start looking at other things. All of that analysis is provided in Shand, in the plurality, citing state law, which has the same genesis as this. So here it's federal? Correct. And I didn't see analysis of federal legislative history. It's the same legislative history that it's coming out of, where this idea of separate degrees of murder occurred. That's what Justice Scalia is providing, is that analysis. Counsel, I wanted to ask about the premeditation issue. I would agree that this is not maybe a typical premeditation case. It's maybe sort of out on the outer perimeter somewhere. But even if we disregarded all of Begola's conduct, his sort of generic homicidal ideations, and we focused only on the conduct immediately before the shooting, wouldn't his alleged actions of bringing the gun, concealing it behind his back, following Bull Bearer to the door, and shooting him point blank in the head, wouldn't that be sufficient to show premeditation, even if it was just for those few seconds? I don't believe so. In this circumstance, I think it at most shows wantonness, which would be second-degree murder in these circumstances. As we know, it was a bit chaotic in the room. As we know, there was drug use and dealing going on. I don't see the premeditation, which first degree requires, in these circumstances. Furthermore, having a loaded firearm in western South Dakota on the reservation, Pine Ridge Reservation, is not unusual. Those sorts of circumstances don't necessarily indicate a premeditated design to kill someone. But the jury found it, right? You're saying the jury got it wrong. Yes. And that there was insufficient evidence to establish that. I would like to reserve the floor to Mr. Kelderman. Mr. Kelderman. Good morning, Your Honors. May it please the Court and Counsel Eric Kelderman on behalf of the United States. I'm going to just briefly address the premeditation issue that was being discussed just a moment ago. Counsel characterized the room as chaotic. And as I read the transcript, I don't see any chaos that came out of that room until the shooting occurred. People were milling around, talking. There was a drug deal going on, and there was drug use going on. But it was anything but chaotic. It was actually a quite calm situation. And what happened was the defendant, Begola, Ms. Goings, was outside at a car. He comes walking up. He waves, goes inside, and he's standing around a table, I think just up against a wall near her. And as he's talking to her, she notices his behavior changes. Now, the significance of that change perhaps isn't anything that she would have given any thought to. But eventually what happens is people start moving, and they're talking about leaving to go to a convenience store. They're going to go buy cigarettes. And Judge Graz, as you noted, that's when he positioned himself in behind Sloan Bull Bear, and he had the gun hidden behind his back. And then he put it up, and the testimony from Buckman was that he put it an inch away from the head and pulled the trigger. That's when the chaos happened. That's when everything broke loose and became, I guess, a situation where everyone just started running. I wanted to follow up on that a little bit, because I think that all happened within a matter of a few seconds. Correct. And so my question is, does premeditation have to be with respect to a specific victim? Because most of the evidence here seemed to be sort of generic homicidal ideations. I'm going to kill somebody, something big is going to happen, I need to take somebody's spirit. But not with respect to this victim until just the last few seconds. In Hayes v. Lockhart, this court said that premeditation means there must exist in the mind of the assailant before the act of killing a specific intent to take the life of the person slain. Is that the precedent, or is that just with respect to that specific case? Well, I guess I would — I believe that it is, because I was unable — I did not come across that case, I don't believe. I don't recall reading that line. But I was looking for something that said specifically the intent, the premeditation, has to go specifically to the victim. Well, there may be other cases of origin in general. And that's my belief, Your Honor, is that it doesn't have to be so specific as to an individual person. Well, but once you pull the trigger, you know, it can be nearly instantaneous, right? And so once you decide to pull the trigger and fire into the back of somebody's head, that premeditation to kill that particular person exists, right? I mean, and the other question about that is that, you know, if you read the language that Judge Strauss put out in his premeditation, Judge Strauss quoted broadly, well, you get the whole body of cases like the Leopold and Loeb cases that no one can ever be convicted of. Where you go out, you start the day with no intent to kill any particular person. You're just going out to find a person that you're going to kill because you want to know what it feels like to kill somebody. Which, you know, we see those cases arising on — in our federal case law with some unfortunate degree of regularity, right? The other, like, sort of category of cases are the people who say, after they've killed somebody, I just wanted to know what it would feel like, right? And I've had that very case, I've tried twice as a state judge and once as a federal judge. So that's not an unheard-of phenomenon, right? And we've never had any problem finding those people guilty of first-degree murder because it's been premeditated, even though now no victim was identified until somebody serendipitously fell into their hands. And that kind of goes back to my question to counsel for Mr. Vila. What about the actions right before the shooting? Is that sufficient, the concealing the gun behind the back, the following, the point-blank shooting? The — this court in Blue Thunder, it's 604 F. 2nd, and the specific site is page 533, said that showing premeditation does not require the government to show a defendant deliberated for any specific amount of time before committing the murder. Here, what we have is we have Colton Begola positioning himself. Again, he's just standing there, but to say that he's positioning himself because we know what followed. He put himself in a position where Goings is starting to walk out the door. And by the way, she wasn't outside the door. She was right just in front of Bull Bear when this happened. Then we have Bull Bear, and then Begola puts himself in there with a gun hidden behind his back, and he goes up and puts it an inch away from his head. All of these things follow what happened earlier in the day when he's talking to Billy Reddy at Reddy's home about taking a soul, about needing to kill someone. And he specifically mentioned two people in there, Scud Martin, Dale Martin, Jr., and also Ben Freeman. Freeman was one of the individuals at this place. And then he said, and the third person, though he couldn't think of the third person at that time. He specifically talked about another individual. And then Reddy was, I guess, the fourth of the four people. He specifically talked about a fourth person. He didn't name that person for whatever reason. And that morning, you know, Reddy just thought, well, he's depressed, he's having some problems. He offered to help him. Well, then we get a conversation earlier, later the same day, but earlier in the evening, where he's talking to Devin Janisse, and he tells Janisse, big things are going to happen. So he's got something going on in his mind. And again, he's going there with a gun. Not uncommon anywhere in South Dakota for a person to walk somewhere with a firearm, and that's not unusual. But it's the combination of all these things. And the jury heard it, and the jury, again, I go back to this frequently in arguing cases like this, but the jury was properly instructed, and they made the finding. They came to the conclusion that they did. And so given the case law, particularly Blue Thunder, and that's a 30-plus-year-old case, it's longstanding precedent from this Court, and it says that the premeditation can arise very quickly. So with all of those things, I believe that premeditation was shown. On the issue of the expert, I'll just briefly address that. Special Agent Fair is an individual. Even the testimony in this case, and I'm sure this Court has seen his testimony in other cases, he's a veritable encyclopedia when it comes to firearms. He knows so much about so many firearms, and he actually did describe everything that he knew about this .38 Smith & Wesson caliber firearm in this case. He just didn't have an exemplar. He just didn't have one to test. It seems like what he described was identifying scroll work, which identified the gun, that once the gun was identified, it was known to be a .38 caliber firearm. It's an antique firearm, as you know, and I guess I own about four of them that I got from my grandfather, right, because they're built before 1900, and they are what they are. But there's nothing about that gun that would indicate that it would ordinarily not be capable of being rendered a working model, that it could not shoot a .38 caliber round. I mean, really the only argument here appears to be the claim that, well, he didn't have an exemplar to compare to. Is that required, and if so, why would it be required? I don't believe it is required, Your Honor. I have never seen any requirement for such a thing. He testified about the basis for his knowledge. He testified about his knowledge about these firearms. He described, here's all the different things about this firearm. Even the grips on the thing were unique. He knew all about it. He just didn't have one that he could put in his hand and look at. No test firing is required, even in firearms cases where we have to prove that there was a felon who possessed a firearm and we have to show that it actually was a firearm. Here, we're not really looking for all of those details like we are in those felon and possession cases. This is just something that was capable of discharging a round. So really all you've got is his testimony is on the Facebook page, there's him and there's this gun. This gun is an identifiable gun because of the unique scroll work that's on it and its other characteristics, the manual ejector, all of those things. It's an old gun. It was built before 1890 and it's a .38 caliber. That's all that he really said and then he said it can't be ruled out. That's the testimony, that's the whole testimony. That is it. At that point, it seems to me that that's kind of the stuff of experts generally. Otherwise, you're in a situation where you can never obtain a murder conviction by gun unless you have the gun in your possession. I agree with all of those things, Your Honor. The situation here was what Fair offered was here's what I can tell you about this firearm that's on this guy's Facebook page. Franz Meritz and Dr. Hobby, Dr. Hobby testified about the bullet that was found in his head. Franz Meritz examined that and said this is a, I believe he's the one that said it's a .38 wadcutter round. What was unique about that is that, as I understand it, I'm no expert, a wadcutter round has a flatter top. It makes it a shorter bullet and this specific .38 firearm that was shown on the Facebook page requires a shorter bullet. It wouldn't be able to take a longer Smith & Wesson .38 round from today. So that wadcutter is another thing that just made it a little bit unique. So Special Agent Fair's testimony was limited. And again, the jury was instructed about how do you use expert testimony and they evaluated it and they looked at it and apparently rejected the defense argument with regard to the believability or what should be taken with his testimony. He was cross-examined thoroughly about the limitations of his testimony and he didn't hide any limitations. It just had a certain amount of usefulness. On top of his testimony, it wasn't that the jury didn't have plenty of evidence about the shooting. It's like when you see contrails in the sky. You don't have to always see the airplane to know what put them there. Reddy turned around on the night of the murder. He turned around and saw Bogola's arm in the air right after he heard a pop. Buckman unequivocally saw Bogola take the firearm and put it an inch away from Bobear's head and pull the trigger. Freeman heard a pop. He turned and saw Sloan Bobear fall. So did Cassandra Goings. She was the first one that was headed out. She was right in front of Bobear. Reddy exclaims right there that he shot, that Bogola shot Bobear. And not only that, Bogola, Reddy turns and asks, what was that? What the F? And Bogola responds, I just shot him. He's dead. So all of that evidence showed that this murder was committed and that this guy committed it. Special Agent Fair's testimony that this Facebook page, this firearm shown on a Facebook page could possibly have been used in this was just a small piece of corroborating evidence. This isn't the thing that put it over the top. And so it was just a small part of the overall framework. This murder and the premeditation involved in it was shown amply. The evidence was more than sufficient to sustain the conviction in all respects. Very briefly, as to the crime of violence issue, Janice was a second-degree murder case, but it unequivocally stated that murder committed with malice of forethought reaches the crime of violence level, and it's sufficient under, well, now it's under this Court's case law, and it's binding precedent, I believe, when it comes to a murder committed with malice of forethought like this first-degree premeditated murder. The United States believes that it's at minimum persuasive authority, along with the Jackson case from the Fourth Circuit that was cited in the briefs and also mentioned earlier today. Based on all those things, the United States submits that the case was amply proven, and it asks the Court to affirm the convictions in all respects. Thank you. Thank you. I'd like to begin by addressing the premeditation element in the discussion that was had with Russell. There were four people identified, Mr. Reddy, Mr. Scud, and Mr. Freeman, and the fourth person was Mr. Begola himself, suicide. That was on page 481 of the transcript. He identified four people he would need to kill. Taking a soul was a reference to intravenous drug use, not to killing these four people. It would be redundant if it meant taking a soul, meaning IV drug use with Reddy, and then also, oh, or I'm going to kill you. He's talking about four identified potential victims. As Your Honor pointed out, in the previous case law, this Court has used the term the direct object. They need to premeditate to kill that person. This sort of carries over to our analysis of first-degree murder under 1111, because sort of transferred intent, perpetrated from a premeditated design unlawfully and maliciously to affect the death of any human being other than him who is killed. That's a different aspect of first-degree murder, which wasn't alleged in this case, which wasn't charged. But under our theory, because it's indivisible, that's included within the charge of first-degree murder. That's the problematic position taken by the government. They're both alleging that he had a premeditated design to kill other people and then happened to kill the victim. That's a different aspect. Finally, the government's reading of Janisse is overbroad, because it reaches to felony murders, which can be committed without the intent necessary, the mens rea necessary, to target or to use force against the person of another. I see my time has run out. Thank you.